IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | \* | |
| | \* | |
| MICHAEL ANTHONY HICKSON | \* | |
| | \* | |
| **and** | \* | |
| | \* | |
| ALVITA K. GUNN, | \* | Criminal Case No. RWT-09-213 |
| | \* | Civil Action No. RWT-13-2790 |
| Petitioners, | \* | Civil Action No. RWT-14-167 |
| | \* | |
| v. | \* | |
| | \* | |
| UNITED STATES OF AMERICA, | \* | |
| | \* | |
| Respondent. | \* | |
| | \* | |

## MEMORANDUM OPINION

Petitioners and co-defendants Michael Anthony Hickson ("Hickson") and Alvita K. Gunn ("Gunn") (Hickson and Gunn collectively referred to as "Petitioners") have filed Motions to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255.[1]  ECF Nos. 692 and 700.

Also pending are a flurry of related motions filed by Hickson:

- Motion for Re-Submission of Defendant's Amended 2255 Memorandum of Support for Defendant's 2255 Filing Based on Second Altered January 21, 2011 Transcript not Discovered until after Original Submission, ECF No. 708;
- Motion for Recusal of Trial Judge from Ruling on Defendant's 2255 Motion Based on Judicial Nonfeasance, Malfeasance, and Bias, ECF No. 709;
- Motion to Change Jurisdiction, ECF No. 710;
- Motion for Release Pending Adjudication of 2255, ECF No. 713; and
- Request for Chief Judge Chasanow to Recuse Trial Judge Titus from Ruling on Defendant's 2255, ECF No. 716.

---

[1] Gunn has adopted the arguments of Hickson, and the arguments she raises in her § 2255 motion are largely the same as the arguments raised by Hickson, so the Court considers their motions together.

Gunn has also filed a Motion for Release Pending Adjudication of 2255. ECF No. 711. For the reasons more fully stated below, Petitioners' motions will be denied.

**BACKGROUND**

**I.     Metro Dream Homes and Petitioners**

From 2005 through 2007, the leadership of the Metro Dream Homes ("MDH") program made extraordinary promises to investors. For an upfront investment of $50,000, not only would MDH make an investor's monthly mortgage payment, but would also pay off the investor's mortgage in full in five to seven years, no matter how much remained on the mortgage. ECF No. 698 at 2. MDH supposedly used investor funds to purchase "POS Cafés," which consisted of ATM/check-cashing machines, point-of-sale vending machines, and "electronic billboards," i.e. flat-screen televisions that displayed advertisements. *Id.* Investors were told that POS Cafés would generate the massive revenues required to meet MDH's massive obligations.[2] *Id.*

Although MDH did purchase some POS Cafés, these generated almost no revenue. *Id.* In reality, MDH relied entirely on new investor funds to pay its obligations to investors. *Id.* MDH was thus a classic Ponzi scheme, and like all Ponzi schemes, it collapsed. The collapse was precipitated in August 2007 by a series of negative articles in the Washington Post, and a cease-and-desist order issued by the Maryland Securities Commissioner prohibiting MDH from enrolling new investors. *Id.* at 2-3. The leadership of MDH attempted to stave off the inevitable by initiating a lawsuit in this Court to enjoin the Maryland Securities Commissioner from

---

[2] These claims were truly extraordinary. If an investor invested $50,000, and had a 30-year mortgage of $500,000, for MDH to be able to use that initial investment to make just the investor's minimum monthly mortgage payment over the life of the mortgage would require an outrageous annual return on investment of 30%. Paying the mortgage off in five years, as MDH promised, would require an astronomical annual return on investment of 180%! And these numbers ignore the payment of interest on the mortgage's outstanding balance.

enforcing the cease-and-desist order, a request which the Court denied.[3]  On October 10, 2007, the collapse became complete when the Circuit Court for Prince George's County froze the assets of MDH and ordered that its records be examined.   ECF No. 429-14.    On October 29, 2007, the Circuit Court ordered MDH into receivership.   ECF No. 429-12 at 3. Invotex, Inc. ("Invotex") was appointed as receiver, and Invotex principal Raymond Peroutka handled the receivership.  ECF No. 411 at 12.

Petitioners knew well before the collapse of MDH that its reality did not come close to matching its promise.  Gunn was one of MDH's earliest employees.[4]  ECF No. 458 at 1.  In August 2006 MDH retained Hickson as a consultant.  ECF No. 624 at 87-88.  In that role, and with Gunn's assistance, *id.* at 88, Hickson prepared and presented in November 2006 an accounting report for MDH's leadership.  ECF No. 450-1.   In that report, nearly a year before its collapse, Hickson presciently pointed out that MDH was "so vulnerable to collapse…it is alarming" and could be characterized as a scam.  *Id.* at 3.  In December 2006, after giving this report, Hickson was hired as chief financial officer of MDH.   *United States v. Hickson*, 506 Fed. App'x 227, 228 (4th Cir. 2013).  He served as CFO until MDH's inevitable collapse in October 2007.  *Id.*   As CFO, Hickson drew a $200,000 salary, and benefited from the use of a home and luxury automobile at MDH's expense.  ECF No. 450 at 3.  For her part, Gunn was paid $211,000 over the year and a half that she worked at MDH.  ECF No. 458 at 1.  Hickson also testified before this Court in connection with MDH's lawsuit.  In his testimony, Hickson denied that MDH was a Ponzi scheme or that new investor money was needed to pay off old investors.  *Id.* at 5.

---

[3] *See Williams, et al. v. Lubin*, 516 F. Supp. 2d 535 (D. Md. 2007).
[4] Gunn held a number of positions throughout her tenure at MDH, all in executive management.  At one time she was chief financial officer of MDH, but when Hickson was hired to that position, she became senior vice president. ECF No. 727 at 1.

## II.     Trial

### A. Pretrial

On April 22, 2009, a grand jury returned an indictment charging Petitioners, as well as Andrew Williams and Isaac Smith, with one count of conspiracy to commit wire fraud, fifteen counts of wire fraud, and one count of money laundering for their participation in the MDH scam.  ECF No. 1.  In addition, Hickson was charged with one count of perjury for his prior testimony before the Court.  *Id.*  Petitioners pled not guilty.  ECF Nos. 23 and 26.  Trial was set to begin on June 1, 2010.  ECF No. 42.  As the trial approached, Hickson expressed concern to his attorney that they would not be ready, given the large volume of documents the Government had recently provided.  ECF No. 437-4 at 17.  Hickson wanted time to review each document, so his attorney requested a continuance of the trial, which the Court granted over the Government's opposition.  ECF No. 109

Hickson's attorney spent significant time preparing for Hickson's trial, meeting with Hickson, reviewing documents, and engaging the services of a financial expert.  *See* ECF No. 437-4 (email communications between Hickson and his attorney); ECF No. 698-1 (CJA invoices).  However, during a two-month period from October to December 2010, Hickson's attorney was trying a death-eligible case for another client.  ECF No. 590 at 13.  While Hickson was able to work with his financial expert on his defense during that time, Hickson's attorney understandably was not communicative.  Both Hickson and the investigator became worried by the lack of communication as the time for trial drew near.  *Id.*  at 4.  Once the other trial concluded, however, Hickson's attorney resumed contact and continued preparing for his trial. ECF No. 437-4.

### B.  Trial and Hickson's Decision to Go *Pro Se*

Petitioners and Isaac Smith proceeded to trial on January 11, 2011.  After four days of trial, Hickson had apparently seen enough.  On January 18, 2011, Hickson informed the Court that, after two years of extensive pretrial preparation, these four days of trial conclusively demonstrated that his attorney was unable to adequately handle his defense, and he requested another continuance to secure new counsel.[5]  ECF No. 590 at 3-29.  The Court refused to continue the trial while Hickson attempted to find another attorney, and admonished him to attempt to reconcile his differences with his attorney.  *Id.* at 4.  The next day Hickson informed the Court of his decision to proceed *pro se*, a decision the Court accepted only after a lengthy colloquy.[6]  ECF No. 591 at 3-10.  Petitioners presented a defense of good faith at trial, attempting to show that as high-ranking officers of MDH, they were not aware of its true financial condition.  The jury disagreed and convicted Petitioners on all counts.  ECF No. 337.

### C.  Post-Trial and Sentencing

Hickson filed numerous post-trial motions, including multiple requests for a new trial in which Gunn joined.  The Court denied all of these motions.  ECF No. 417.  Hickson's presentence report recommended a sentencing guidelines range of 324-405 months.  ECF No. 450.  Gunn's recommended a guidelines range of 210-262 months.  ECF No. 440 at 9.  However, the Court's sentence for each of the Petitioners reflected a significant downward variance from the guidelines range.  Hickson was sentenced to 120 months imprisonment, and Gunn to 60 months.  ECF Nos. 477 and 479.  The Fourth Circuit affirmed Petitioners' convictions.  *United States v. Hickson*, 506 Fed. App'x 227 (4th Cir. 2013)

---

[5] Gunn also expressed dissatisfaction with her attorney on January 18, 2011, and indicated her desire to discharge her counsel, but eventually decided to retain her attorney.

[6] Hickson's appointed attorney remained as standby counsel for Hickson, but eventually was unable to continue due to illness, and Hickson was appointed substitute standby counsel.

# ANALYSIS[7]

In their motions, Petitioners assert a number of grounds for relief.  In their § 2255

motions, Petitioners collectively claim:

- prosecutorial misconduct by allowing Michael Worthy to refuse to testify on the basis of the privilege against self-incrimination, even though Worthy had "absolute immunity" from state and federal prosecution;
- improper suppression of exculpatory financial statements; and
- selective prosecution, because others culpable in the MDH scam have not been brought to justice.

ECF Nos. 692 and 700.  Each also claims ineffective assistance of their respective attorneys.

Hickson claims ineffective assistance of counsel for his attorney's failure to conduct a reasonable

investigation, effectively cross-examine witnesses, and for lack of communication.  Gunn claims

ineffective assistance of trial and appellate counsel for her attorney's failure to discover and

make the arguments she now raises in her § 2255 motion.  *Id.*

In his "Request for Re-Submission of Defendant's Amended 2255 Memorandum of

Support for Defendant's 2255 Filing Based on Second Altered January 21, 2011 Transcript Not

Discovered Until After Original Submission," Hickson claims he is entitled to submit a new

§ 2255 motion based on the fact that he received two different transcripts of Raymond

Peroutka's testimony.  ECF No. 708.

In his Motion for Recusal of Trial Judge from Ruling on Defendant's 2255 Motion Based

on Judicial Nonfeasance, Malfeasance, and Bias, Hickson argues recusal is required due to:

- the Court's refusal to continue Hickson's trial while he searched for a new attorney; and

---

[7] As the Government points out, all of the claims raised in Hickson's § 2255 motion, except for his ineffective assistance of counsel claims, could be considered procedurally defaulted, as they were not raised on appeal. ECF No. 698 at 4-5.  Peppered throughout Hickson's § 2255 motion (and his other motions), however, are fervent assertions that he is actually innocent, and that a miscarriage of justice has occurred.  If Hickson could demonstrate this, his claim would not be procedurally defaulted.  *See, e.g., United States v. Pettiford*, 612 F.3d 270, 280 (4th Cir. 2010).  Although these assertions are baseless, demonstrating why they are baseless would involve addressing the merits of each of Hickson's claims.  Accordingly, the Court will assume, without deciding, that Hickson's claims are properly raised, and address each on its merits.

- the Court's sustaining an objection to Hickson's line of questioning of a witness.

ECF No. 709.

In his Request for Change of Jurisdiction, Hickson reasserts his argument regarding the January 21, 2011 transcript, and also objects to the Clerk of the Court "changing" the indexing of the exhibits in his motions in a way that supposedly made those filings hopelessly confusing to readers.  ECF No. 710.

In their Motion for Release Pending Adjudication of 2255, Petitioners assert they are entitled to release because of the high probability of success of their § 2255 motions. ECF Nos. 711 and 713.  Finally, in his Request for Chief Judge Chasanow to Recuse Trial Judge Titus from Ruling on Defendant's 2255, Hickson reasserts various claims raised in his other motions.  ECF No. 716.

Many of Petitioners' claims have been litigated before.  Some are new.  All are meritless. The Court addresses each below.

### I.      § 2255 Petition

### A.  There Was No Prosecutorial Misconduct in Allowing Michael Worthy to Invoke his Privilege Against Self-Incrimination

Petitioners argue that their due process rights were violated because exculpatory evidence, in the form of the testimony of Michael Ron Worthy, was improperly withheld from the jury when Worthy was allowed to refuse to testify by invoking his Fifth Amendment privilege against self-incrimination.  ECF No. 692 at 6.[8]  According to Petitioners, Worthy actually had complete immunity from criminal prosecution for his actions as general counsel of MDH, and so was not entitled to invoke his privilege against self-incrimination.  *Id.*  However,

---

[8] Where Gunn and Hickson make the same arguments in their § 2255 motions, this Opinion will refer to Hickson's motion.

there is no evidence that Worthy actually had immunity from prosecution at the time he was called to testify.

Invotex, as part of the receivership of MDH, pursued possible claims against those who might be liable to MDH.  ECF No. 429-12 at 7.  One of those claims was against Michael Worthy, who served as general counsel for MDH, and who allegedly gave MDH bad legal advice that its investment contracts were not securities.  Invotex and Worthy settled this claim, and the settlement agreement was approved by the Maryland court overseeing the receivership. ECF No. 429-10.  The settlement agreement contains standard language releasing all claims Invotex, MDH, or related entities may have been able to assert against Worthy.  *Id.* at 12-13. Petitioners assert that this release language "prohibits the State of Maryland as well as the Federal Government from prosecuting Worthy for any past, present or future acts concerning his role as general counsel to Metro Dream Homes."[9]  ECF No. 692-1 at 3.

The settlement agreement does not immunize Worthy from criminal prosecution.  The settlement agreement releases Worthy from:

> [A]ny and all past, present or future *claims, demands, obligations, duties, liabilities, actions, causes of action, rights, damages, punitive damages, costs, losses of services, expenses, financial responsibilities, attorneys' fees and compensation* of any nature whatsoever, whether based on a *tort, contract*, or other theory of *recovery*.

ECF No. 429-10 at 13 (emphasis added).  Quite clearly, the settlement agreement is focused on releasing Worthy from liability for any *civil* claims for damages, not from criminal prosecution.

---

[9] Petitioners make much of the fact that Invotex prepared a draft complaint alleging that Worthy was responsible for $70 million of losses to MDH.  ECF No. 692-1 at 9.  A draft civil complaint alleging one person is responsible for certain losses is hardly relevant to a criminal determination of responsibility, particularly in a conspiracy case in which multiple people can be responsible for the same criminal conduct.  Moreover, the Court notes that Invotex settled that $70 million claim against Worthy for under $600,000.  Finally, to the extent Petitioners feel the draft complaint represents Invotex's final determination that Worthy, and Worthy alone, was responsible for MDH's losses, Invotex's final report specifically identifies Hickson and Gunn as control persons of  MDH, and states that the only reason for not pursuing litigation against them was that this criminal action, which included the possibility of forfeiture, was pending.  ECF No. 429-12 at 8.

Nothing in the language of the settlement agreement purports to immunize Worthy from criminal liability. Criminal liability is not mentioned anywhere in the settlement agreement.

Further, a civil settlement agreement between private parties cannot provide immunity from criminal prosecution. Petitioners fail to point to anything that would have given Invotex, a non-governmental entity, the authority to initiate a criminal prosecution against any individual, or to give any individual immunity from criminal prosecution. Petitioners' argument is based on a fundamental misunderstanding of the principles of civil settlements and immunity from prosecution, and is entirely without merit.[10]

### B. Suppression of Financial Statement did not Violate *Brady* or *Giglio*

Petitioners argue that the Government withheld a bank statement covering the time period from October 19, 2007 through November 16, 2007, during which fraudulent, exculpatory, and impeachable transactions were conducted by Raymond Peroutka on the MDH accounts. ECF No. 692-1 at 14-26. Assuming the Government had possession of this statement, *Brady v. Maryland*, 373 U.S. 83 (1963), would have required its disclosure only if it contained exculpatory information. *Giglio v. United States*, 405 U.S. 150 (1972), would have required its disclosure only if its contents could have been used to impeach a government witness. However, the bank statement Petitioners point to would not have been exculpatory as to them, nor would it have impeached Peroutka, and therefore its disclosure was not required.

---

[10] The Court also notes that Petitioners fail to identify any aspect of Worthy's potential testimony that would have been exculpatory, or even relevant, in the criminal trial. Apparently, had Worthy testified, Hickson would have elicited that he misled the leaders of MDH, including Petitioners, as to whether they were selling securities. ECF No. 692-1 at 6. But Petitioners were not charged with a violation of any securities laws. Nor was the factual predicate of the charges against them that they falsely told investors that their contracts with MDH were not securities. Rather, the factual predicate of the charges was that Petitioners participated in a conspiracy to intentionally lie to investors about the *financial condition* of MDH, in order to induce them to invest in MDH. ECF No. 1 at 4-10. That Petitioners might have thought, in good faith, that MDH was not selling securities, would have been irrelevant to whether they thought, in good faith, that the financial condition of MDH was being truthfully represented. Thus, even if Worthy wrongfully claimed his Fifth Amendment privilege, his testimony would not have been exculpatory.

The indictment charged that the criminal conduct in this case continued "through in or about October 2007," and does not allege any specific criminal conduct after July 20, 2007. ECF No. 1.  Maryland froze the assets of MDH on October 10, 2007, which effectively ended Petitioners' involvement with MDH.  ECF No. 429-14.  There was no attempt to hold Petitioners responsible for any of the transactions shown on the bank statement they claim was suppressed. Therefore, the bank statement could not have been exculpatory.

Further, Petitioners fail to provide any basis for their conclusory allegation that the transactions they identify constituted illegal conduct on the part of Peroutka that could have undermined his credibility.  The gravamen of their argument is because *Petitioners* cannot explain the transactions, those transactions must have been illegal. Given that Invotex was operating under the order of a court, and had to account to that court for its activities in receivership, *see, e.g.,* ECF No. 429-12, pursuant to which no allegations of wrongdoing were ever made, the Court is not inclined to join Petitioners in making this leap of logic.  There is simply no reason to credit their conclusory, baseless, and self-serving allegations of illegality. Accordingly, there is no reason to conclude that, even if the Government did not disclose the bank statement, this was improper, because it would have been of no value whatsoever to Petitioners' defense.

### C.  Petitioners did not Suffer from Ineffective Assistance of Counsel

Petitioners each argue that they suffered from ineffective assistance of counsel. Ineffective assistance of counsel claims are analyzed under the two part test of *Strickland v. Washington*, 466 U.S. 668 (1984).  This test requires Petitioners to show that their attorneys' performance was so deficient that it fell below an objective standard of

reasonableness, and that they suffered prejudice as a result.  *Id.* at 687-88.  They have failed to make this showing.

       **i.**       **Hickson's counsel was effective**

Hickson has been arguing ineffective assistance of counsel, on what seems like a continuous  basis, since he first indicated dissatisfaction with his attorney on January 18, 2011.  Scouring the record anew for evidence that Hickson's attorney was ineffective, the Court again finds none.  Rather, as noted above, the record reflects a tremendous amount of time spent by Hickson's attorney preparing for trial and communicating with Hickson regarding his defense.  *See* ECF No. 437-4 (email communications between Hickson and counsel); ECF 698-1 (CJA invoices).

Hickson argues that his attorney failed to search for, and find, exculpatory evidence relating to Peroutka's actions as receiver and Worthy's liability for the MDH scam.  ECF No. 692-1 at 29-30.  As explained above, this evidence was not exculpatory or even relevant.  A "failure" to find irrelevant evidence that would not have been helpful is not deficient performance, nor could it have prejudiced Hickson.

Hickson also points to the two-month gap in communication while his attorney tried a serious criminal case for another client.  However, his attorney had spent considerable time prior to this gap preparing for Hickson's trial.  ECF No. 367.  Further, Hickson's financial expert testified that, despite the lack of communication, counsel "clearly…was prepared" for trial.  ECF No. 426 at 46.  While he may have been frustrated by the lack of communication during this time, Hickson has failed to demonstrate how additional meetings with his attorney would have led to a different outcome, and thus has failed to make out an ineffective assistance of counsel

claim merely because of this brief lack of communication.  *Lenz v. Washington*, 444 F.3d 295, 303 (4th Cir. 2006).

Finally, Hickson argues that his attorney's cross-examination of a government witness, Carole Jones, was ineffective because he failed to elicit certain information from her. ECF No. 692-1 at 27.  Given the extensive investigation Hickson's attorney undertook prior to trial, it would be inappropriate for the Court to second guess his strategic decision regarding what questions to ask during cross-examination.  *See Powell v. Kelly*, 562 F.3d 656, 670 (4th Cir. 2009) ("Once counsel conducts a reasonable investigation of law and facts in a particular case, his strategic decisions are virtually unchallengeable.") (internal quotation marks omitted).

### ii.      Gunn's counsel was effective

Unlike Hickson, Gunn retained her court-appointed counsel.  Her ineffective assistance of counsel argument rests on her attorney's "failure" to find any of the exculpatory evidence she claims entitles her to § 2255 relief and to present it at trial or on appeal.  ECF No. 700-1 at 38-46.  As explained above, none of that evidence is exculpatory, or would have assisted in Gunn's defense.  Therefore, her attorney's alleged failure to investigate and find this evidence did not make her performance deficient, nor did it prejudice Gunn.

### D.  There is no Evidence of Selective Prosecution

 "The defendant believes that the government targeted him because he refused to accept a plea agreement."  ECF No. 692-1 at 39.  This is probably true, in the sense that the Government does prosecute those who do not plead guilty to crimes.  But that is not grounds for a claim of selective prosecution.  Improper selective prosecution occurs when the decision to prosecute is made for reasons, such as a person's race or religion, that would violate the equal protection

component of the Fifth Amendment.  *See United States v. Armstrong*, 517 U.S. 456, 464 (1996).

Without delving into the finer points of equal protection doctrine, it is sufficient to note that

"persons who plead not guilty to crimes" is not a protected class that implicates equal protection

concerns.  Petitioners have failed to identify any impermissible consideration that led to the

Government's decision to prosecute them.  Accordingly, they have no claim for selective

prosecution.

###    II.       Hickson's Motions for Recusal

Hickson argues that the undersigned should recuse himself from consideration of

Hickson's § 2255 motion, and also requests that the Chief Judge of the Court force his recusal.

ECF Nos. 709 and 716.  Recusal is required, according to Hickson, because the Court refused to

continue the trial so he could search for a new attorney, and because the Court sustained an

objection to Hickson's line of questioning of a witness.

Federal law requires recusal of a judge from "any proceeding in which his impartiality

might reasonably be questioned."  28 U.S.C. § 455(a).  Neither of Hickson's grounds for recusal

satisfies this standard.  Essentially, Hickson is arguing that recusal is required because the Court

made rulings adverse to him at trial.  But petitions for habeas relief under 28 U.S.C. § 2255 are

made to "the court which imposed the sentence."  This provision would make no sense if recusal

were required on the basis of adverse rulings at the criminal trial resulting in a petitioner's

sentence, because "the court that imposed the sentence" will almost always have made some

adverse ruling against the petitioner at trial.  If Hickson felt the Court's rulings at trial were

wrong, the appropriate remedy was to appeal those rulings.[11]  But the mere fact that the Court made rulings adverse to Hickson does not require recusal.[12]

### III.    Other Motions

As the Court is denying Petitioners' § 2255 motions, their Motions for Release Pending Adjudication of 2255, ECF Nos. 711 and 713, will be denied as moot.

Hickson has failed to articulate any need to resubmit his § 2255 petition as requested in his Motion for Re-Submission of Defendant's Amended 2255 Memorandum of Support for Defendant's 2255 Filing Based on Second Altered January 21, 2011 Transcript not Discovered until after Original Submission.  ECF No. 708.  Based on two separate requests, Hickson received two different transcripts of Raymond Peroutka's trial testimony, with minor differences between the two.  One of the transcripts is mislabeled as "Wednesday, January 21, 2011."  *Id.* at 2.  As Hickson astutely points out, January 21, 2011 was actually a Friday.  *Id.*  Also, the pagination on the transcripts is different.[13]  However, as to Peroutka's, testimony the transcripts are substantively identical.  The minor differences between the two transcripts do not warrant resubmission of Hickson's § 2255 petition.  Therefore this motion will be denied.

Hickson's Motion for Change of Jurisdiction, ECF No. 710, is equally unfounded.  The supposed mislabeling of exhibits does not necessitate a change in jurisdiction.

---

[11] Of course, if Hickson had won an appeal, the case would have been remanded to the undersigned, with no requirement for recusal.

[12] In addition, Hickson cites no authority that would allow the Chief Judge of a District Court to require another judge's recusal.

[13] Hickson requested transcripts of Raymond Peroutka's trial testimony in connection with a hearing regarding the fraud loss amount from the MDH scam, and was provided a transcript that was an excerpt of the January 21, 2011 proceedings, with only Peroutka's testimony.  ECF No. 406.  Apparently Hickson's appellate counsel requested transcripts of Peroutka's testimony in preparation for Hickson's appeal, resulting in the other January 21, 2011 transcript.  ECF No. 708 at 2.  This transcript is from the full transcript of the January 21, 2011 proceedings, but with only the pages containing Peroutka's testimony.  The 19 pages that are "missing" at the beginning of the transcript reflected preliminary matters from that day's proceedings, but no witness testimony, and the "missing" pages after Peroutka's testimony contained testimony from other witnesses and other matters.  ECF No. 635 (full January 21, 2011 transcript).

**CERTIFICATE OF APPEALABILITY**

A certificate of appealability will only issue if Petitioners have made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c); *Hardy*, 227 Fed App'x. at 273.  A petitioner "satisfies this standard by demonstrating that reasonable jurists would find that any assessment of the constitutional claims by the district court is debatable or wrong and that any dispositive procedural ruling by the district court is likewise debatable." *United States v. Riley*, 322 Fed.  Appx.  296, 297 (4th Cir. 2009).  The Court has assessed Petitioners' claims. They have failed to raise a cognizable § 2255 claim in which a reasonable jurist could find merit, and thus no certificate of appealability shall issue.

**CONCLUSION**

For the aforementioned reasons, Petitioners' motions will be denied and no certificate of appealability shall issue.  A separate Order follows.


November 18, 2014                          _____/s/_____
                                          Roger W. Titus
                                          United States District Judge